# CARRIE V. C. WANN, Appellant, v. JOHN SCULLIN et al.

### Division Two, March 17, 1908.

1. **PRINCIPAL AND AGENT: Sale by Agent to His Own Corporation.** It is not an arbitrary rule that an agent to sell cannot sell to a corporation in which he is a stockholder, without disclosing to his principal the fact that he is a stockholder and receiving the consent of his principal to the sale in the light of such disclosure. The principal must show that some prejudice or injury resulted to him from the fact that his agent was thus related to the purchasing corporation.

2. ———: ———: **Fraud and Deceit: Fraud in Law.** In an action for fraud and deceit by the principal against his agent to sell, it cannot be said without qualification that the mere fact that the agent is a stockholder of the purchasing corporation entirely disables him from representing his selling principal unless he discloses that he is a stockholder. The court will not declare, in such case, as a matter of law, that concealment by the agent of his relationship as a stockholder to the purchasing corporation and of the identity of the purchaser, constituted his act a fraud.

3. ———: ———: ———: ———: **Concealment.** Defendant, president of the Wiggins Ferry Company, telegraphed from St. Louis to all non-resident stockholders: "I am offered $500 per share for a majority or all of the stock of the Wiggins Ferry Company. Have agreed to sell all my holdings and strongly recommend you to do likewise. If you concur in my recommendation, send me your stock by mail immediately, and if the owners of a majority of stock agree to sell, I will forward to you $500 per share for your holdings on or before May 5th next. Wire reply immediately." Plaintiff, who lived in Chicago, telegraphed acceptance, and thereupon defendant signed an agreement for plaintiff with a trust company, which was "acting for other parties" who proved to be a railroad company in which defendant owned 5,000 shares of the stock, by which agreement defendant obligated plaintiff to sell and deliver to the trust company her fifty shares of stock upon the signing of the agreement by the owners of a majority of the stock. The price of $500 was the price the railroad company had made and the trust company was to receive only a small commission from the purchaser. The next day plaintiff mailed her stock and on its receipt defendant delivered it to the trust company, which sent her a draft for $25,000, which she cashed on May 15th. After the

stock was received and delivered, another trust company undertook to buy a majority of the ferry company stock for another railroad, and late in that day the stock reached $600 per share and in a few days $1,525 per share. Plaintiff sues, in fraud and deceit, for $75,000, and the jury awarded her $50,000. Defendant sold his own stock (800 shares) at $500, and sent the same telegram to all stockholders. Up to that time the market price of the stock had been not to exceed $250 per share. No actual fraud of any kind was shown. *Held*, that the mere fact of defendant's failure to disclose to plaintiff that he was a stockholder in the railroad company, the intending purchaser, was not in law a fraud upon plaintiff, and did not disqualify him from receiving her stock and delivering it to the trust company under the terms of the telegram; and the court erred in instructing the jury that if he concealed from her the fact that he was such stockholder and she was ignorant of such fact and she because of such concealment was deprived of her stock and the opportunity to sell it, she was entitled to recover; and also erred in not directing a nonsuit.

4. ————: ————: ————: ————: ————: **Material Induce-ment.** An instruction which does not require the jury to find that the failure of the agent to disclose to his principal that he was a stockholder in the railroad company to whom he was selling her stock, was a material inducement to her action to sell and to send her stock to him to be delivered, is fatally defective.

Appeal from St. Louis City Circuit Court.—*Hon. Horatio D. Wood*, Judge.

AFFIRMED.

*John A. Gilliam* and *Luther Ely Smith* for appellant.

(1) An agent who possesses an interest in conflict with the interest of his principal cannot act for his principal without disclosing to the principal such adverse interest. 1 Clark & Skyles, Agency (1905), sec. 406, p. 910; Mechem on Agency, secs. 66, 67, p. 48; Cook v. Berlin, etc., Co., 43 Wis. 448. (2) An agent owes the duty to act towards his principal in the most perfect good faith and loyalty to his principal's interest. Labinski v. Holst, 84 N. Y. Supp. 991; Snell v. Good-

lander, 90 Minn. 534; Fulton v. Walters, 28 Pa. Sup. Ct. 271; Euneau v. Rieger, 105 Mo. 675; Holmes v. Cathcart (Minn.), 60 L. R. A. 734; Bank v. Simons, 133 Mass. 415. (3) An agent to sell cannot sell to himself without the knowledge and consent of the principal. Snell v. Goodlander, 90 Minn. 534. (4) An agent to sell cannot sell to a partnership of which he is a member without the knowledge and consent of the principal. Fry v. Platt, 32 Kan. 67; Francis v. Kerker, 85 Ill. 190; Zahn v. McMillin, 179 Pa. St. 150. (5) An agent to sell cannot sell to a corporation in which he is a stockholder without disclosing to his principal the fact that he is a stockholder in such corporation, and receiving the consent of his principal to the sale in the light of such disclosure. McCullough v. Bank, 111 Ga. 132; Mulvane v. O'Brien, 58 Kan. 463; Devoue v. Fauning, 2 Johns. Ch.; San Diego v. Railroad, 44 Cal. 116; Wilbur v. Lynde, 49 Cal. 190; Sterling v. Smith, 97 Cal. 345; Mechem on Agency, sec. 455; Salomons v. Pender, 3 Hurlst. & C. 367; Goodin v. Canal Co., 18 Ohio St. 182; Fuller v. Dame, 18 Pick. 483; Cone v. Russell, 48 N. J. Eq. 212; Guernsey v. Cook, 120 Mass. 50; West v. Camden, 135 U. S. 507; Jones v. Williams, 139 Mo. 33; 1 Clark & Marshall on Corporations, sec. 7h, p. 23; Bank v. Trust Co., 187 Mo. 534; Cincinnati Volksblatt Co. v. Hoffmeister, 62 Oh. St. 201, cited and approved in Guthrie v. Harkness, 199 U. S. 155; State ex rel. v. Standard Oil Co. (Mo.), 91 S. W. 1072; State v. Standard Oil Co., 49 Oh. St. 178; Munson v. Railroad, 103 N. Y. 73; Jackson's Admr. v. Company, 31 N. J. L. 278. Stockholders in a corporation are the real parties in interest. They in reality compose the body corporate. 26 Am. and Eng. Ency. Law (2 Ed.), 901; 7 Ib., 633, 634; Atkins v. Gamble, 43 Cal. 99; State v. Standard Oil Co., 49 Ohio St. 137, 34 Am. St. 541; State v. Standard Oil

Co., 49 Ohio St. 178; In re Palmer's Estate, 76 N. E. 13; Jones v. Williams, 139 Mo. 25.

*Klein & Hough, Rowell & Zumbalen* and *Joseph S. Laurie* for respondents.

(1) The action of the court in sustaining the motion for a new trial on the ground that plaintiff's instruction 2 should have been refused, was proper. Said instruction was based upon the theory that Scullin's failure to disclose to plaintiff the fact that he was a stockholder in the Chicago, Rock Island & Pacific Railway Company, and that the offer to purchase was made by that company, was a fraud upon plaintiff which entitled her to recover against defendant Scullin. (a) The instruction is erroneous because the failure to disclose to plaintiff the fact that he was a stockholder in the Rock Island Company and that said company was the intending purchaser, was not in law a fraud upon the plaintiff, and did not disqualify him from receiving from plaintiff her stock and delivering the same to the Mercantile Trust Company under the terms of the telegram of April 24th, and did not entitle her to recover against him. Hardwick v. Jones, 65 Mo. 54; Kitchen v. Railroad, 69 Mo. 224; Gaty v. Sack, 19 Mo. App. 470; Van Dusen-Harrington Co. v. Jungeblut, 75 Minn. 299, 77 N. W. 970; Alexander v. Williams, 14 Mo. App. 13; Ins. Co. v. School District, 25 C. C. A. 492; Northrup v. Ins. Co., 48 Wis. 420; 1 Thompson on Corporations, sec. 1071; 1 Morawetz on Corporations, sec. 521. (b) The rule requiring the agent to disclose his adverse interest applies only to agents who are intrusted with a discretion in the matter of the agency, and is not applicable where the principal makes his own bargain and the agent is a mere ministerial one, without any discretion. Tiffany on Agency, p. 418; Mechem on Agency, sec. 67; Pollatschek v. Goodwin, 40 N. Y. Supp. 682; Gold Mining Co. v. Fox, 4 Ired.

Eq. 61; Spalding v. Mattingly, 89 Ky. 83; Knauss v. Brew. Co., 142 N. Y. 70; Ranney v. Donovan, 78 Mich. 318; Kilbourn v. Sunderland, 130 U. S. 505; Atwood v. Railroad, 85 Va. 966.   (c) The instruction is erroneous for the further reason that it does not require the jury to find the essential elements in an action of this kind, that the facts concealed were material and that plaintiff would not have sent her stock to Scullin, had she known that he was a stockholder in the purchasing company. 14 Am. and Eng. Ency. Law (2 Ed.), 113; Wannell v. Kerm, 57 Mo. 478; Bailey v. Smook, 61 Mo. 213; Dunn v. White, 63 Mo. 181; Powell v. Adams, 98 Mo. 598; Feller v. McKillip, 100 Mo. App. 664; Tinker v. Kier, 195 Mo. 183; 20 Cyc., 23 and 40; Jordan v. Pickett, 78 Ala. 331.   (2) The motion for a new trial was properly sustained, because the trial court erroneously refused to give the instructions asked in behalf of each of the defendants at the close of the plaintiff's case. These instructions should have been given as to all three defendants, because:   (a)   There was no evidence of any fraud having been perpetrated by either of the defendants nor of any fraudulent motive or intent on their part; hence, there was no evidence which would authorize a recovery under the pleadings as against either of the defendants.   20 Cyc., 35; Koontz v. Kaufman, 31 Mo. App. 397; Florida v. Morrison, 44 Mo. App. 538; Tootle v. Lysaght, 65 Mo. App. 139; Culver v. Smith, 82 Mo. App. 390; Lovelace v. Suter, 93 Mo. App. 429; Bank v. Trust Co., 179 Mo. 662; Nations v. Pulse, 175 Mo. 94; Boulder v. Stilwell, 100 Md. 543.   (b)   Plaintiff's evidence disclosed the fact that there had been an accord and satisfaction between plaintiff and defendants as to the subject-matter of this suit.   McCormick v. St. Louis, 166 Mo. 315; Pollman Coal Co. v. St. Louis, 145 Mo. 651; McGregor v. Ware Construction Co., 188 Mo. 611; St. Joseph School Board v. Hull, 72 Mo. App. 403; Andrews v. Stubbs

Co., 100 Mo. App. 599; Perkins v. Hedley, 49 Mo. App. 556; Cornelius v. Rosen, 111 Mo. App. 619; Lightfoot v. Hurd, 113 Mo. App. 612; Rogers v. Publishing Co., 118 Mo. App. 1; Railroad v. Clark, 178 U. S. 353; U. S. Bobbin & Shuttle Co. v. Thistell, 69 C. C. A. 651; Nassoily v. Tomlinson, 148 N. Y. 326; Jackson v. Volkening, 80 N. Y. Supp. 1102; Goss v. Rishel, 85 N. Y. Supp. 1045; St. Regis Paper Co. v. Tonawanda Co., 94 N. Y. Supp. 946; Washington Gas Co. v. Johnson, 123 Pa. St. 576; Keck v. Hotel Co., 89 Iowa 202; Truax v. Miller, 48 Minn. 62; Creighton v. Gregory, 142 Cal. 34; Leather Co. v. Foyer, 104 Ill. App. 268; Canton Coal Co. v. Parlin, 215 Ill. 244; Richardson v. Taylor, 100 Me. 175. (c) The instructions asked on behalf of defendants Mercantile Trust Company and Wade should have been given, because there was no evidence whatever that defendant Wade had any knowledge at the time of the transactions that Scullin was a stockholder in the Rock Island Company, and there was no pretense that the trust company was chargeable with such knowledge, except through Wade. (3) Instruction 4 fixed the measure of damages at such sum in excess of $500 per share for which the plaintiff could have replaced her stock in the open market within a reasonable time after she received notice that she had been deprived of her stock, together with interest at six per cent per annum in the discretion of the jury. (a) This being an action for fraud and deceit, the rule of damages thus announced is wholly inapplicable to the case. Corder v. O'Neill, 176 Mo. 441; Gerst v. St. Louis, 185 Mo. 191; Smith v. Bolles, 132 U. S. 125. The rule announced in said instruction is applicable only in cases of trover and conversion. 26 Am. and Eng. Ency. Law (1 Ed.) 837; Galligher v. Jones, 129 U. S. 193. (b) It was error to instruct the jury that they might allow interest in their discretion. The damages cannot be increased by the addition of interest

in an action of this kind. Corder v. O'Neill, 176 Mo. 441; Railroad v. Knapp-Stout & Co. Company, 160 Mo. 417; Kreibohm v. Yancy, 154 Mo. 84; Coquard v. Prendergast, 47 Mo. App. 243; R. S. 1899, sec. 2869; Watson v. Harmon, 85 Mo. 443; Ferry Co. v. Railroad, 128 Mo. 254; Carson v. Smith, 133 Mo. 606; Kenney v. Railroad, 63 Mo. 99. In any view, it was error to instruct the jury that they might allow interest, without fixing the time from which such interest should be reckoned. As there is no claim in the petition for interest, it was error to instruct that the jury might in its discretion allow interest. Corder v. O'Neill, 176 Mo. 441; Meyer v. Ins. Co., 95 Mo. App. 721; Horner v. Railroad, 70 Mo. App. 285; Farrell v. Ins. Co., 66 Mo. App. 153; Ashby v. Shaw, 82 Mo. 76. (c) The extraordinary prices paid for Wiggins Ferry stock between April 27 and May 5, 1902, by the two trust companies in their effort and contest to obtain the control of the ferry company, are not to be considered as the fair market value of the stock; and as neither of the defendants could have reasonably foreseen or anticipated that such an extraordinary condition would arise when plaintiff's stock was delivered to the Mercantile Trust Company by Scullin, such prices cannot be taken as a criterion by which the liability of the defendants can be measured. Smith v. Bolles, 132 U. S. 125; Fairbanks v. Kerr, 70 Pa. St. 86; City of Allegheny v. Zimmerman, 95 Pa. St. 287; Commission Co. v. Railroad, 64 Mo. App. 590; Kountz v. Kirkpatrick, 72 Pa. St. 392; Smith v. Griffin, 3 Hill (N. Y.) 333; Durst v. Burton, 47 N. Y. 175; Bowker v. Goodwin, 7 Nev. 135; Moffitt v. Hereford, 132 Mo. 518; 3 Parsons, Contracts (8 Ed.), p. 220; 2 Sutherland on Damages, sec. 653; Hogan v. Donohue, 49 Ill. App. 432; Truitt v. Baird, 12 Kan. 420. (d) This being an action for fraud and deceit, the plaintiff's cause of action, if any, was complete when her stock was delivered by Scullin to the

Mercantile Trust Company at ten o'clock of the morning of April 26th; whatever damage she sustained accrued at that time and must be measured by the market value of the stock at that time. Liability does not include the fruits of an unrealized speculation. Smith v. Bolles, 132 U. S. 125; Boulders v. Stilwell, 100 Md. 543; Harrison v. Craven, 188 Mo. 603; Rockefeller v. Merritt, 22 C. C. A. 608; Stratton's Independence v. Dines, 68 C. C. A. 161; Sigafus v. Porter, 179 U. S. 116. (4) The cause of action upon which plaintiff elected to stand and go to the jury was for fraud and deceit, and hence conceded that her title to the stock had passed from her by virtue of the sale thereof to the Mercantile Trust Company. The court, however, by its instructions, wholly ignored the legal effect of the petition and submitted the case to the jury upon a theory wholly inconsistent therewith, viz.; that the defendants had converted the stock to their own use and that the title thereto still remained in plaintiff at the time of the trial. It was error for the court to submit the cause to the jury upon a theory different from that stated in the petition, or to enlarge the issues made by the pleadings. Riley v. Cullen, 159 Mo. 322; Estes v. De Noyer, 155 Mo. 577; Anderson v. Gaines, 156 Mo. 664. (5) The record discloses that plaintiff has not proved the cause of action stated in the petition, and that she was not damaged by any acts of defendants. Such being the case, this court should end the litigation and direct a final judgment for defendants. R. S. 1899, sec. 866; Mining Co. v. Webster, 193 Mo. 351.

GANTT, J.—This action was commenced in the circuit court for the city of St. Louis on May 15, 1902, and contained but one count, charging the defendants with having converted to their use fifty shares of stock in the Wiggins Ferry Company, which belonged to the plaintiff. Thereafter on December 1, 1902, plaintiff

filed an amended petition in one count against each. The defendants filed a motion to strike out certain portions thereof as irrelevant and redundant, which motion was sustained by the court. On June 2, 1903, plaintiff filed her second amended petition containing three counts, the first count being for fraud and deceit, the second count containing all the allegations of the first with additional averments concerning the defendant Scullin's agency for plaintiff and his consequent duties and liabilities. The third count was for conversion of plaintiff's said stock. Before proceeding to trial the defendants filed their motion to require the plaintiff to elect whether she would stand upon the first and second counts or the third count, on the ground that the latter was inconsistent with the first and second, the one being an affirmance of the sale and the other disavowing the sale. This motion was sustained and plaintiff elected to proceed to trial upon the first and second counts of the second amended petition and after the evidence for the plaintiff had been heard, the court required the plaintiff to elect upon which of the two counts she would ask the verdict of the jury, for the reason that they both were for the same cause of action in different forms, and plaintiff elected to stand on the second count. The cause was submitted to the jury under the instructions of the court, and on March 7, 1904, the jury returned a verdict for the plaintiff against all of the defendants, assessing plaintiff's damages at the sum of fifty thousand dollars. In due time the defendants filed their motion for a new trial, and this motion for new trial was sustained by the court on the ground that the second instruction given for the plaintiff should have been refused. Defendants also filed a motion in arrest of judgment, which was by the court overruled and exceptions duly saved. From the judgment and order of the court granting a new trial, the plaintiff prosecutes this appeal.

The second count of the petition in this cause covers thirteen pages of printed matter. In substance plaintiff states that on the first day of April, 1902, she was the owner of fifty shares of stock in the Wiggins Ferry Company, and was a member of a voting trust which included a majority of the stock of the said Wiggins Ferry Company, the entire stock being ten thousand shares of the par value of one hundred dollars each, and the trustees of such voting trust were John Scullin and Festus Wade and Alonzo C. Church; that said Scullin was president of the Wiggins Ferry Company and also a director and an owner of a large amount of stock in the Mercantile Trust Company, and was an old and valued friend of Frederick A. Wann, the husband of the plaintiff. That Festus J. Wade was a director in the Wiggins Ferry Company, president of the Mercantile Trust Company and owned a large amount of stock therein and was a friend and business adviser of plaintiff. That said Scullin was a large owner of the stock and bonds of the St. Louis, Kansas City and Colorado Railroad Company, and believing that he was about to make a sale of the said railroad company and said Wiggins Ferry Company to the Chicago, Rock Island & Pacific Railway Company, which would enhance the price of the Wiggins Ferry Company stock, he conspired with Festus J. Wade to reduce its earnings temporarily by lowering its charge for carrying goods, the two concealed the expected sale to the Rock Island Company and both then tried to purchase the stock of the Wiggins Ferry Company at the reduced price caused by their reduction of charges, and, among others, Festus J. Wade applied to plaintiff to buy her stock; that about April 19, 1902, said Scullin succeeded in selling the St. Louis & Colorado Railway to the Rock Island Company, and by such sale, said Scullin became personally interested in the stocks and bonds of the Rock Island Company

to the extent of about two million dollars, and it became to his interest as the owner of said stocks and bonds of the Rock Island Company to buy for it the stock of the Wiggins Ferry Company at the lowest prices that he could get the same, and pledged himself to the officials of the Rock Island Company to use all his influence to buy for said railway company all or a majority of the stock of the Wiggins Ferry Company at five hundred dollars per share; that Festus J. Wade and the Mercantile Trust Company, knowing the interest of said Scullin in the Rock Island Company, and in the Mercantile Trust Company, on or about the 21st day of April, 1902, conspired with said Scullin to buy the stock of the Wiggins Ferry Company, including the stock owned by plaintiff, at the lowest possible price, the said Mercantile Trust Company to get two and one-half per cent on such stock as it bought, the said Trust Company knowing the fiduciary relations held by said Scullin and Wade to the Wiggins Ferry Company and the fiduciary relations existing between said Scullin and Wade and the members of the voting trust in the said Wiggins Ferry stock; that in pursuance of such conspiracy, the defendants in order to cheat and defraud plaintiff out of a great part of the value of her Wiggins Ferry stock, and with intent to lull plaintiff and keep her from taking action to protect her interest and to keep her from advising with other persons, and with intent to fraudulently get possession of her said stock, sent her on April 24, 1902, the following telegram:

ST. LOUIS, Mo., April 24th, 1902.

Mrs. Carrie V. C. Wann,

Care F. A. Wann, 4731 Ellis Ave., Chicago.

I am offered five hundred dollars per share for a majority or all of the stock of the Wiggins Ferry Company. Have agreed to sell all of my holdings and strongly recommend you do likewise. If you concur in my recommendation, send me your stock by mail imme-

diately, and if the owners of a majority of stock agree to sell, I will forward to you five hundred dollars per share for your holdings on or before May fifth next. Please regard this as strictly confidential. Wire reply immediately.

JOHN SCULLIN,
Pres. Wiggins Ferry Company.

And said Wade in furtherance of said conspiracy, wired plaintiff's husband as follows:

ST. LOUIS, Mo., April 24th, 1902.
F. A. Wann, 4731 Ellis Ave., Chicago.

John Scullin's telegram to your wife explains why I did not reply to your letter.

FESTUS J. WADE.

That, upon the receipt of said telegram, the defendants having fraudulently concealed from plaintiff John Scullin's interest in the Rock Island Company, and that the said company was the intending purchaser, and that the Mercantile Trust Company was the agent of the Rock Island Company to make said purchase and said Scullin's interest in the Mercantile Trust Company, and believing that John Scullin had no interest in conflict with hers, and that as president of the Wiggins Ferry Company and trustee of the voting trust was in good faith seeking to forward her interest and that in applying to her for the possession of her stock and agency to sell the same he was acting in good faith, plaintiff wired said Scullin that she would forward her stock to him, and on April 25, 1902, mailed her stock to him with the following letter:

CHICAGO, April 25th, 1902.
Mr. John Scullin,
    Pres. Wiggins Ferry Company,
        St. Louis, Mo.

My dear sir: Many thanks for your telegram, which was received at my house late last night. I answered you immediately

that I would forward my stock this morning, so I take pleasure in enclosing you herewith fifty shares, certificate No. 293, and I trust the sale will go through, as per your telegram.

Yours very truly,<br>CARRIE V. C. WANN.

Plaintiff states that upon receiving said stock of plaintiff's, said Scullin, upon a date unknown to plaintiff, delivered it to said Wade as the representative of the Mercantile Trust Company, the purchasing agent of the Rock Island Company, without any authority from her to him so to do and without any knowledge on her part that he intended so to do and said Scullin claims he signed in plaintiff's name a paper reading as follows:

ST. LOUIS, Mo., April —, 1902.

The Mercantile Trust Company, acting herein for other parties, offers to purchase a majority of the shares of the capital stock of the Wiggins Ferry Company, a corporation existing under the laws of Illinois, and agrees to pay therefor on the delivery of the certificates for so many of said shares not less than a majority as shall be deposited with said Trust Company on or before May 5, 1902, properly endorsed in blank for assignment and transfer on the books of said Ferry Company, the sum of five hundred dollars per share. The Trust Company, acting in the capacity as agent for other parties, is to receive from such other parties for its services a commission of two and one-half per cent upon the purchase price.

The Mercantile Trust Company will not be obliged to accept any stock, unless the owners of a majority of shares have agreed to sell same to said Mercantile Trust Company, agent, on or before May 5, 1902.

MERCANTILE TRUST COMPANY,<br>By FESTUS J. WADE, President.

The undersigned stockholders of the Wiggins Ferry Company do hereby accept the foregoing proposition and sell to the Mercantile Trust Company, on and subject to the terms therein stated, the number of shares of the capital stock of the Wiggins Ferry Company set opposite our respective names.

Plaintiff states that she knew nothing of such paper or the terms thereof, or that said Trust Company was purchasing said stock, and never authorized or ratified the signing of said paper by said Scullin in her name, and the concealment from her by the defendants of the interest of said Scullin in the Rock Island Company and the commission to be obtained by the Trust Company was a fraud upon plaintiff, and was done with intent to cheat and defraud plaintiff out of the value of her said stock, and all of the defendants knew of said concealment and knowingly participated therein with intent to cheat and defraud plaintiff and to get her said stock at less than its value. Plaintiff further states that notwithstanding the telegram of said Scullin to her named the price of five hundred dollars per share as the price at which the stockholders were to sell their Wiggins Ferry stock and that price was to be sent her by said Scullin if the majority of the stockholders sold at that price and said Scullin and said Wade and Mercantile Trust Company were bound to exercise good faith towards plaintiff, yet, on April 26, 1902, said defendants were notified that one hundred dollars more per share than five hundred dollars per share could be obtained for all or a majority of said Ferry Company stock, but defendants refused to notify the stockholders of said offer; and, because of the interest of the said defendants, concealed said offer from the stockholders of the said Wiggins Ferry Company, and got signatures to the contract above set forth, at five hundred dollars per share by concealing said offer, and on Sunday, April 27, 1902, bought 604 shares of said stock at one thousand dollars per share, but did not disclose such purchase to plaintiff, and got signatures to said paper for 267 shares at five hundred dollars per share with the agreement that they would cancel the signatures if not satisfactory to the principal, and at no time obtained signa-

tures by persons authorized to sign, or which were afterwards ratified, for a majority of said stock at five hundred dollars per share, and at no time got a majority of the shares of the said Wiggins Ferry Company delivered to them at any price, yet defend-, ants, so concealing said offer from plaintiff and their agreements from her and their purchases at one thousand dollars per share with intent to deceive and defraud plaintiff and to induce her to believe that they had obtained a majority of said stock at five hundred dollars per share and to keep her from inquiry and action in regard to said stock, sent her the following false and misleading dispatch, to-wit:

St. Louis, Mo., April 27, 1902.

Carrie V. C. Wann,

Care F. A. Wann, Chicago, Ills.

The Mercantile Trust Company pledges its honor to the statement that it has already contracted for purchase for more than a majority of the stock of Wiggins Ferry Company. If you have not already done so, send in your certificate and receive payment according to terms.

Mercantile Trust Company,

By Festus J. Wade, President.

Plaintiff states that said Mercantile Trust Company at the time of sending said dispatch claimed to have signatures of 5522 shares of said stock; that 554 shares thereof never had signed at five hundred dollars, but only at one thousand dollars per share. That sixty shares had been signed at five hundred dollars per share, but said Trust Company agreed to give one thousand dollars per share to get the stock. That 267 shares had been signed at five hundred dollars per share by an agent, with the agreement that it should be cancelled if the principal did not approve the same and on Monday, April 28, 1902, seven hundred dollars per share was paid for the same, the principal having

disapproved the sale. That at the time of sending the said dispatch signers of shares to the number of 1484 had withdrawn from said paper, as they had a lawful right to do. And the signatures for 630 shares were made by persons who had no authority to sign said paper and whose authority was never ratified, and 613 shares were cancelled and the parties refused to deliver the said stock until the said Trust Company paid them therefor prices ranging from seven hundred dollars to fifteen hundred dollars per share. Plaintiff states that the said Trust Company never did get in its possession for delivery to the said Rock Island Company as many as 4300 shares of said Wiggins Ferry stock; that the total number of shares in said company was ten thousand, and it required five thousand and one shares to make a majority. And the Mercantile Trust Company got only about two thousand and twenty-four shares at five hundred dollars per share, and those by fraud and deceit and concealment, and it got about 2275 shares in addition by paying from seven hundred to fifteen hundred and twenty-five dollars per share therefor, and by reason of said John Scullin securing from plaintiff the possession of her stock and agency to sell her stock, the said defendants became and were bound to get $1,525 per share for her said stock for her. It is further alleged that on April 27, 1902, plaintiff received the following dispatch:

ST. LOUIS, Mo., April 26, 1902.

Mrs. Fred A. Wann,
    4731 Ellis Ave., Chicago.

All my family and myself have sold our stock in Wiggins Ferry Company to Mississippi Valley Trust Company of this city for five hundred dollars per share cash, with provision that if they get a majority they will pay an additional one hundred dollars per share. Proposition open to all stockholders. I recommend your immediate acceptance by wire. Please advise me, care Mississippi Valley Trust Company.

A. C. CHURCH.

To which plaintiff, not knowing the situation clear-ly, replied by telegram as follows:

CHICAGO, April 27th, 1902.

A. C. Church,

　　　Care Mississippi Valley Trust Company, St. Louis, Mo.

Many thanks. Have sent stock to Mr. Scullin, who will protect my interests. Please see him.

MRS. F. A. WANN.

At the same time plaintiff's husband sent John Scullin the following telegram:

CHICAGO, April 27, 1902.

John Scullin,

　　　Pres. Wiggins Ferry Company, St. Louis, Mo.

Understand if purchaser gets majority stock, will pay one hun-dred dollars per share additional. Kindly look out for Mrs. Wann's interest.

F. A. WANN.

These two last mentioned dispatches were sent before said Mercantile Company's dispatch of April 27 was received, and plaintiff not knowing the real situa-tion, began to make inquiry and learned on April 28, 1902, that the Mercantile Trust Company on one side and the Mississippi Valley Trust Company on the other were each endeavoring to purchase a controlling interest in said Wiggins Ferry Company for a principal at that time undisclosed and unknown to plaintiff and that this contest for control began on April 26, 1902, and the Wiggins Ferry Company stock rapidly ad-vanced, and plaintiff, having concealed from her de-fendant Scullin's interest in the Mercantile Trust Com-pany and the Rock Island Railway Company and his agreement with the Rock Island Railway Company, wired him as follows:

Wann v. Scullin.

CHICAGO, April 28th, 1902.

John Scullin, St. Louis, Mo.

I understand Wiggins Stock seven hundred and fifty dollars to-day. Trust you will get this or better for Mrs. Wann's small holding. We need the money and I assure you it will be appreciated.

F. A. WANN.

And plaintiff, also believing that Festus J. Wade was bound in honor to act for her best interest, by her agent, wired him the following:

CHICAGO, April 28, 1902.

Festus J. Wade, St. Louis, Mo.

Understand Wiggins stock seven hundred and fifty dollars or better. Mr. Scullin has wife's. Hope you will get her highest.

F. A. WANN.

No response came to either of these telegrams, but on April 29th, plaintiff received the following letter:

MERCANTILE TRUST COMPANY, ST. LOUIS,

April 28th, 1902.

Mrs. Carrie V. C. Wann, care Mr. F. A. Wann, C. & A. R. R., Chicago, Ill.

DEAR MADAM: Enclosed please find our treasurer's check for twenty-five thousand dollars, in payment for your fifty shares of stock in Wiggins Ferry Company, sold by you in accordance with the terms of the proposition made by this company and accepted by you. Kindly acknowledge receipt of same, and oblige.

Yours very truly,

FESTUS J. WADE,

President.

The Mercantile Trust Company's check for $25,000 was enclosed in this letter. On April 29, 1902, plaintiff having received no satisfactory answer to her telegrams of April 28, 1902, sent Mr. Scullin the following telegram:

CHICAGO, April 29, 1902.
John Scullin,

    President Wiggins Ferry Company,

        St. Louis, Mo.

    If you are unable to deliver majority of· Wiggins Ferry stock
to Mercantile Trust Company, or party whom you are dealing with
on or before May fifth, kindly advise me at once what action you
have taken to protect my interests.  I understand the Mississippi
Valley Trust Company offer to-day six hundred dollars per share
or more for any and all stock.  I will, of course, expect you to pro-
·tect my interests fully.  Please answer.

                                    CARRIE V. C. WANN.


    In response to this telegram Mr. Scullin sent plain-
tiff the following dispatch:


                        ST. LOUIS, Mo., April 29th, 1902.
Carrie V. C.· Wann, care F. A. Wann, C. & A. R. R., Chicago.

    Mercantile Trust Company mailed you check last night in full
payment for stock it bought of you last week.  Mercantile Trust
Company, its president and myself pledge our individual honor that
we now have a majority of all the stock contracted for and exer-
cise the right to pay you for your stock on or before May fifth.

                                    JOHN SCULLIN.


    After receiving this telegram plaintiff and her
husband on the morning of April 30, 1902, left Chicago
for St. Louis, where they arrived on the evening of
the 30th of April, 1902.   On the next day, plaintiff
and her husband learned that Wiggins Ferry stock
had been bought by the Mercantile Trust Company at
fifteen hundred dollars per share, and she and her
husband went to the defendant Wade, and the Mer-
cantile Trust Company, with said check, and informed
said company and said Wade that plaintiff was dis-
satisfied with said sale, when said Wade informed
them that he had plaintiff's stock and proposed ·to
keep it.   They then went to see. defendant Scullin on
May first, and told him of their dissatisfaction, and

he at first said he would see what could be done, but
on the next day, said he had no time to talk about
it and plaintiff finding that the Mercantile Trust Com-
pany was determined to keep her stock and that Wade
and Scullin refused to talk with her about the alleged
sale, returned with the said check to Chicago, Illinois,
and plaintiff has retained the said check and elected
to sue the defendants for their fraud and deceit.

Plaintiff states that by reason of the concealments
by the defendants and the telegrams sent to her with
intent to deceive, lull and defraud her and by their
withholding said fifty shares of stock from her, de-
fendants have deprived plaintiff of the greater part of
the value of said fifty shares of stock; that the said
stock was worth at least $1,525 per share; that it was
the duty of the defendant, Scullin, to have obtained
that price for her, but because of his conspiracy with
the said Wade and the said Mercantile Trust Company
to get her said stock at $500 per share, and because of
the concealments, misrepresentations and deceits know-
ingly perpetrated by and participated in by all of said
defendants, plaintiff, instead of receiving seventy-six
thousand, two hundred and fifty dollars for said stock,
has received only twenty-five thousand dollars there-
for, and has wholly lost fifty-one thousand, two hun-
dred and fifty dollars and the interest thereon, where-
by and because of the premises, defendants have be-
come liable to her for the amount of said loss. Where-
fore, she prays judgment for $75,000.

The defendants for their answer to the said first
and second counts of plaintiff's second amended peti-
tion, admit that on the first day of April, 1902, plain-
tiff was and had been the owner for a long time of
fifty shares of stock in the Wiggins Ferry Company,
of the par value of one hundred dollars each; admit
that the defendant Scullin was president and director
of the Wiggins Ferry Company and a stockholder in

the Mercantile Trust Company, and defendant Wade was a director in the Wiggins Ferry Company and president of the Mercantile Trust Company; admitted that on the 24th of April, 1902, said Scullin sent to plaintiff the telegram set forth in the second amended petition to the effect that he was offered five hundred dollars per share for a majority of all of the stock of the said Wiggins Ferry Company and recommended her to agree to sell her holdings at such price. They admitted that on April 25, 1902, plaintiff, in response to said telegram, mailed her stock to said Scullin, with a letter of the same date, set forth in the petition, and that said Scullin, immediately upon receipt of said stock, delivered the same to the Mercantile Trust Company, and at the same time signed for plaintiff and in her name, the acceptance of the proposition made by the Mercantile Company to purchase a majority of its shares of the capital stock of the said Wiggins Ferry Company for the sum of five hundred dollars per share as set forth in the second amended petition; admit that on April 28, 1902, the defendant Wade as president of the said Trust Company, sent plaintiff a letter set forth in said petition and enclosed a check of the Mercantile Trust Company to plaintiff for twenty-five thousand dollars in payment of her fifty shares of stock, and that on April 29, 1902, said Scullin advised plaintiff that said Mercantile Trust Company had mailed her a check in full payment of her stock and that plaintiff received and retained said check, and defendants deny each and every other allegation contained in said court. Further answering, the defendants say that after the signing by defendant Scullin, in behalf of plaintiff, of the acceptance of the proposal of the Mercantile Trust Company to buy Wiggins Ferry stock as set forth, and the delivery by said Scullin of plaintiff's stock to the Mercantile Trust Company, a dispute arose between the plaintiff and the Mercantile

Trust Company as to the validity and construction of the contract under which the Mercantile Trust Company claimed to have acquired the right to buy plaintiff's stock at five hundred dollars per share, and there was a dispute between said parties as to the amount which the plaintiff was entitled to receive from said trust company for her stock. The Mercantile Trust Company claiming that the plaintiff was only entitled to be paid at the rate of five hundred dollars per share for her stock, forwarded her a check for the sum of twenty-five thousand dollars to be taken by the plaintiff in full payment for her said fifty shares of stock; that said check was thus delivered to plaintiff upon the condition that she accept it in full discharge and satisfaction of her entire demand for the value of her stock and all liability growing out of said transaction, and defendants state that plaintiff having received said check did, with full knowledge of said condition, collect the same, and appropriate the proceeds to her own use. And further answering, defendants say as to plaintiff's allegations that Scullin had no authority to dispose of her stock and no authority to accept for her the above-mentioned proposal of the trust company, or to deliver her stock to said company, that plaintiff with full knowledge of all the facts concerning the transaction accepted and collected the check for twenty-five thousand dollars delivered by the Mercantile Trust Company to, her as aforesaid in, payment for her said stock. And for answer to the second count of the said petition, defendants say that the same averments contained in the first count and concerning which admissions are made in the answer herein to the said first count of said second amended petition are repeated in said second count and defendants simply for the purpose of avoiding a repetition of said admissions reiterate the same and deny each and every other allegation in said count. And the remainder of

the answer to said second count is a repetition of the matter set forth in the answer to the first count stating in substance that plaintiff received a check in full payment of her said shares of stock after a dispute had arisen between her and the Mercantile Trust Company as to her right in the premises.

The reply is a general denial, and a further denial that she had any dispute with the defendants before she received the check and denies that she had knowledge of all the facts prior to the filing of this suit and the taking of depositions therein.

On the trial before the jury the evidence tended to show that the Wiggins Ferry Company was an Illinois corporation, which had existed many years prior to 1902. Its capital stock was $1,000,000, divided into ten thousand shares of the par value of $100 each. Prior to the contest between the Mercantile Trust Company and the Mississippi Valley Trust Company for the acquisition of a majority of the capital stock, a contest which began late in the afternoon of Saturday, April 26, 1902, the stock was selling in the open market in the city of St. Louis at $236 to $237 per share, although one witness testified that he understood it had sold as high as $250 per share, and another that to the best of his recollection the market value varied from $250 to $280 per share prior to April 24, 1902, but he could not testify to any actual sales. Up to April 21, 1902, John Scullin and David R. Francis were the joint owners in equal shares of all of the capital stock of the St. Louis, Kansas City & Colorado Railway Company, at that time an incomplete railroad between St. Louis and Kansas City, having an entrance into the city of St. Louis to the Union Station over the Wabash Railway. Shortly after April 1, 1902, the officers of the Chicago, Rock Island & Pacific Railway Company requested their general attorney, Mr. M. A. Low, of Topeka, Kansas, to go to St.

Louis and look over the property of the Colorado Railway Company and ascertain what it consisted of and to see Ex-Governor Francis as to the terms upon which said railroad could be purchased. Mr. Low having reported on the properties to the executive officers of the Rock Island Company was requested by them to arrange a meeting in New York City between said executive officers and Messrs. Scullin and Francis to talk over the matter, and a day was fixed for the conference. This conference occurred in New York on April 17th or 18th, 1902, and the terms of the purchase and sale by Francis and Scullin to the Rock Island Company were agreed upon on Saturday, April 19, 1902, and the papers executed on Monday, April 21, 1902. It appeared by the evidence, to the admission of which the defendants objected, that the terms of the contract between the Rock Island Company and Francis and Scullin were that the Rock Island should pay $750,000 for the terminal properties of the Colorado Company and $30,000 per mile for the completed road, which was estimated at 102 miles, plus $900,000, which had been expended in additional work upon the uncompleted portion thereof. This purchase price was to be paid by the transfer to Francis and Scullin of twenty thousand shares of the stock of the Rock Island Company at $175 per share and the remainder in four per cent bonds of the Rock Island Company, with the right on the part of Francis and Scullin, each, to sell within a time limited to the executive officers of the Rock Island Company five thousand shares of the stock of the Rock Island Company at $170 per share, which rate both Francis and Scullin availed themselves of, thus leaving in the hands of each five thousand shares of that stock. The defendant Festus J. Wade was not in New York during any of the negotiations concerning the sale of the Colorado Railroad, nor until after the contract had been executed. There was no evidence

in the plaintiff's case that Wade had any knowledge of
the terms of that transaction or the fact that Scullin
and Francis had acquired any of the stock in the Rock
Island Company as part of the consideration for the
transfer of the Colorado road. Wade testified pos-
itively that he had no knowledge that Scullin had ac-
quired any shares of stock or had any interest in the
Rock Island Railroad until about the latter part of
June, 1902, and did not learn this fact from Scullin
himself until he heard Scullin's testimony at the trial
of the case. It further appeared that during the ne-
gotiation between Francis and Scullin and the officers
of the Rock Island Company nothing whatever oc-
curred in relation to the property or stock of the Wig-
gins Ferry Company; the Wiggins Ferry Company
was referred to at one time by Mr. Leeds, who asked
about the Wiggins Ferry, and Francis replied, "I have
no interest in the Wiggins Ferry, I do not own a share
of the stock in it and I am not authorized to sell it or
to negotiate for its sale. Mr. Scullin is the president
of the Wiggins Ferry Company." Mr. Scullin then
said: "Wiggins Ferry has nothing to do with this ne-
gotiation for the Colorado road. It is an entirely sep-
arate and distinct property and we are not here to ne-
gotiate for the Wiggins Ferry." Nothing more was
said about the Wiggins Ferry during the negotiations
for the Colorado road. After an agreement had been
reached for the sale of the Colorado road to the Rock
Island the officers of the Rock Island, on Saturday af-
ternoon, the 19th of April, again mentioned the sub-
ject of the purchase of the Wiggins Ferry to the de-
fendant Scullin, and he refused to talk with them in
regard to the matter, stating that he was tired and
wished to think it over on Sunday and would meet them
on Monday. In the meantime, Scullin had reached
Wade by long distance telephone and requested him to
come to New York. Wade arrived in New York Mon-

day morning, April 21, and saw Scullin, who made an appointment to meet him later in the day, not mentioning the Wiggins Ferry Company. After the contract for the sale of the Colorado road to the Rock Island had been executed and on the evening of April 21, Scullin met Wade at the office of the Trust Company of America in New York. Mr. Leeds, the president of the Rock Island Company, testified that late in the afternoon of the 21st, he and his associate took up the negotiations for the Wiggins Ferry Company with Mr. Scullin, and at that conference Mr. Scullin stated that he was willing to sell his stock at $400 per share and to recommend the other stockholders to accept that price, and they were willing to give that figure, but at that point Mr. Scullin said that Mr. Wade was in New York and he felt he would have to call him into the negotiations and have his assistance. Negotiations were then suspended and about an hour later they had another conference, at which Mr. Wade was present. Wade objected to $400 as the price and named $500 per share, and saying that in his opinion a controlling interest could not be obtained for less than $500 per share, and thereupon they agreed to give $500 per share. Messrs. Wade and Scullin thought that price would be satisfactory to the majority of the stockholders. After this price was agreed upon, Wade for the Mercantile Trust Company made a contract with the officers of the Rock Island to buy the stock for them, the Trust Company to receive two and one-half per cent commission on the purchase price. An agreement to this effect was reduced to writing and executed, and Mr. Mather prepared and gave to Mr. Wade the form of the offer, which appears in the petition, and authorized the Mercantile Company to put out that offer and purchase the stock on that basis. Mr. Scullin was to turn in his stock and assist in every way he could to have the control brought in as quickly as possible. He

was to receive no consideration other than the $500 per share for his stock; he was on the same basis as any other stockholder. Scullin thought $500 per share was a big price. He and Wade did not go into detail as to how they proposed to purchase the stock. Scullin made no specific agreement that he would send out letters and telegrams. Mr. Leeds testified neither Mr. Scullin nor Mr. Wade agreed to secure control of the Wiggins Ferry, Mr. Scullin practically spoke only of his own stock and the recommendations which he was willing to make to the stockholders as his idea of what a fair price for the stock would be.

Testimony further showed that Wade became a director of the Wiggins Ferry Company April 1st, 1902, succeeding Judge Madill, then lately deceased. Having become a member of the board, Wade desired to buy some stock in the company so as to have a sufficient interest to justify his giving the necessary time to it. He acquired ten shares before he was elected director and afterwards and before the 19th of April, he had acquired some few additional shares. On April 19th, and before he had learned of any desire on the part of the Rock Island to purchase the Wiggins Ferry property, Wade wrote to Mrs. Wann in which letter he said: "Should you agree to sell any of your holdings, I should be pleased to have you name a price on the same." In answer to that letter under date of April 21, 1902, plaintiff's husband wrote to Wade as follows: "My Dear friend: Your favor of the 19th inst. to Mrs. Wann, is received. Will you kindly advise me what the value of the Wiggins Ferry Company stock is to-day, and what you are willing to pay for it." On April 24th, Scullin having sent the telegram of that date to Mrs. Wann, Wade telegraphed to Wann as follows: "John Scullin's telegram to your wife explains why I did not reply to your letter." It also appears in evidence on the part of the plaintiff

that in April, 1902, John Scullin was the owner of 950 shares of the capital stock of the Mercantile Trust Company. On arriving at St. Louis on the evening of April 24th, 1902, Scullin and Wade sent out letters to all the local stockholders and telegrams to all the non-resident stockholders announcing to them the terms of the offer made by the Rock Island Company for the Wiggins Ferry stock. These telegrams and letters were signed by Scullin as president of the Wiggins Ferry Company. The telegram to the plaintiff is set forth in full in the plaintiff's petition and is of date April 24, 1902. The reply to this telegram and the letter of April 25, 1902, enclosing the stock, are also set forth in the petition. The certificate of the plaintiff's stock was received by Mr. Scullin Saturday morning, April 26, and was immediately delivered to the Mercantile Trust Company in compliance with the terms of the offer made by the Mercantile Trust Company for the Wiggins Ferry stock, the form of which is set forth fully in the petition. After this stock had been delivered by defendant Scullin to the Mercantile Trust Company and sometime in the afternoon between one and two o'clock of Saturday, April 26th, 1902, Mr. Alonzo C. Church, vice-president of the Wiggins Ferry Company, called upon Mr. Scullin and informed him that he had an important matter to communicate to the board of directors of the Wiggins Ferry Company, and requested the director to call a meeting of the board. As all of the directors were then present in Mr. Scullin's office, though not convened or in session as a board, Mr. Church stated that an offer had been made to him of $600 per share for the stock and suggested that the president notify all the stockholders immediately. Mr. Church did not communicate the names of the parties who had made this offer and thereupon the directors dispersed without taking any action. At that

time Mr. Church did not have any binding offer, but about 5 o'clock that afternoon an offer was drawn up in contract form different from that which he had reported to the directors, the offer being to pay $500 per share down as the stock was delivered and another one hundred dollars additional upon their getting a majority of the stock. This offer was not made to the board of directors nor to the directors personally, but was made at the office of the Mississippi Valley Trust Company to such stockholders as they could reach. The evidence tended to show that the Mississippi Valley Trust Company was acting for the Terminal Railroad Association in making its offers for the stock. As an additional consideration for the sale of the stock to the Mississippi Valley Trust Company, that company agreed with all the stockholders of the Wiggins Ferry Company who had already sold and agreed to deliver their Wiggins Ferry stock to the Mercantile Trust Company, to indemnify and save them harmless from all loss against expenses and damages for which they would be liable on account of the breach of their contracts with the Mercantile Trust Company. After five o'clock on Saturday, April 26, 1902, Mr. Church and the officers of the Mississippi Valley Trust Company began to notify the stockholders of the Wiggins Ferry Company of this offer made by the Mississippi Valley Trust Company in behalf of the Terminal Railroad Association, the name of the real purchaser being withheld, and of the offer of the Mississippi Valley Trust Company to indemnify those who had made contracts with the Mercantile Trust Company against damages if they would break their contracts with the Mercantile Trust Company so previously made. In consequence of this contest which was created as above stated between the two trust companies, each endeavoring to obtain a majority of the stock, each of these parties began to pay prices for the stock far in excess of their

open offers. Every purchase made by either company was a private purchase made in private and not a purchase made in the open market. And this contest continued until all the stock had been purchased by the two companies. After the plaintiff's stock had been delivered to the Mercantile Trust Company, she was informed of the offer made by the Mississippi Valley Trust Company by a telegram from Mr. Church dated April 26, 1902, received by her on the morning of the 27th. Thereupon followed the telegram from plaintiff's husband to Scullin on April 27th, and the telegram from the Mercantile Trust Company to Mrs. Wann, in which the Trust Company pledged its honor that it had already contracted for a majority of the stock and the telegram from plaintiff's husband to Scullin of April 28th notifying him that he had heard that the stock was selling at $750 per share and one of the same tenure to Wade from plaintiff's husband of the same date, which was followed by a letter from the Mercantile Trust Company on the 28th of April, enclosing check for $25,000 in payment for plaintiff's fifty shares. On the 29th of April, 1902, Mrs. Wann sent the following telegram to Mr. Scullin:

CHICAGO, April 29, 1902.

John Scullin,
    President of the Wiggins Ferry Company,
        East St. Louis, Illinois.

    If you are unable to deliver majority Wiggins Ferry Company stock to Mercantile Trust Company, or party whom you are dealing with, on or before May fifth, kindly advise me at once what action you have taken to protect my interests. I understand the Mississippi Valley Trust Company offer to-day six hundred dollars per share, or more, for any and all stock. I will, of course, expect you to protect my interests fully. Please answer.

CARRIE V. C. WANN.

The same telegram was sent to Mr. Scullin addressed at St. Louis, Mo.  In response to which Mr. Scullin sent the following telegram:

St. Louis, Mo., Apr. 29, 1902.

Carrie V. C. Wann, care F. A. Wann, C. & A. R. R., Chicago.

Mercantile Trust Company mailed your check last night in full payment for stock it bought of you last week.  Mercantile Trust Company, its president and myself, pledge our individual honor that we now have a majority of all the stock contracted for, and exercise the right to pay for your stock on or before May fifth.

John Scullin.

On the following day plaintiff and her husband came to St. Louis and on the next day, May 1st, they went to the Mercantile Trust Company's office and saw Mr. Wade, and Mr. Wann speaking for the plaintiff said they were not satisfied with the sale of the plaintiff's stock.  Mr. Wade replied he had the stock and proposed to keep it.  The plaintiff herself did not see Mr. Scullin, but Mr. Scullin did see Mr. Wann and told him the matter was out of his hands, that he had no further control over it.  On May 18th, the plaintiff endorsed and deposited the check which had been sent her in payment of her stock, in the First National Bank of Chicago, and it was received by the said bank as cash on that day and credited to the plaintiff's account, and was afterwards, on the 19th of May, 1902, paid by the Mercantile Trust Company.  Mrs. Wann among other things testified she did not think there was anything so very wrongful until she got to St. Louis.  "Q. And you found out it was all wrong, did you?  A.  I did, most emphatically.    Q.  I know, but I want to know what you knew?  A.  Well, that they had my stock and were keeping it, when they were paying other people bigger prices.    Q.  Yes, and you knew that they did not have a majority.  You were informed of that, weren't you?  A.  Yes, sir, everybody was talk-

ing about it on the streets, and everybody else.     Q. You knew then that Mr. Scullin had defrauded you in this matter? A. That was my impression.     Q. You thought that your friend of many years was wrong then? A. I certainly did.     Q. Did you find out that Mr. Scullin was interested in the purchase himself? You charge that in your first petition, filed on the 15th of May. You had found it out before that, hadn't you? A. Before the 15th of May? Q. Yes? A. Yes, sir."

With regard to the check for $25,000, the plaintiff testified that she knew when she received the check that it was intended to be in full payment for her stock. This was substantially all the evidence offered by the plaintiff in the case, except the details of transactions resulting in the purchase of the shares of stock of different stockholders at different prices. At the close of the plaintiff's case, the defendants requested the court to instruct the jury that on the pleadings and the evidence plaintiff was not entitled to recover against either of the defendants, and said instructions were refused and the defendants excepted.

On the part of the defendants the following additional facts were developed:

Mr. M. A. Low testified that on the 2nd day of April, 1902, he was general attorney of the Chicago, Rock Island & Pacific Railway Company, and on that day called on Governor Francis in the city of St. Louis, and inquired whether the St. Louis, Kansas City and Colorado Railroad property was for sale, and a day or two later commenced negotiations with Governor Francis for the purchase of the property, and then met Mr. Scullin for the first time. As a result of these negotiations Francis and Scullin fixed a price at which they would be willing to sell the property, giving Mr. Low an unsigned memorandum of the terms. During these negotiations, Mr. Low asked Mr. Scullin

and Governor Francis if they knew of any ground suitable for terminal purposes on the east side of the river, and Mr. Scullin answered that the Wiggins Ferry Company owned some land adjoining the Vandalia property and thought that perhaps it could be purchased. That was all that was said concerning the Wiggins Ferry at that time. During the negotiations in New York concerning the Colorado Railroad, Mr. Scullin was asked if the Wiggins Ferry was for sale, and he said he would not discuss that question at present, that one trade was enough at one time, that until the sale of the Colorado property was completed he would not discuss the sale of the Wiggins property. After the contract for the sale of the Colorado Road had been signed, Judge Moore on behalf of the Rock Island Company asked Mr. Scullin if the Wiggins Ferry property was for sale, and Mr. Scullin said he thought it could be bought and the price was discussed. Afterwards at a meeting of the parties on Monday afternoon, April 21, 1902, Mr. Wade was present for the first time and when the price of $400 per share was mentioned, he said he did not believe that the stock could be bought at that figure. He thought it could be bought for $500 per share, to which the Rock Island people finally agreed and the contract was made employing the Mercantile Trust Company to purchase the stock. To the suggestion made by the Rock Island people that it might be well to try to purchase the stock quietly, Mr. Wade said he would not buy it that way; that he would make an offer that would be public and open to every stockholder, he thought that the just way to buy it, and they finally agreed that it might be purchased in that manner. Both Mr. Scullin and Mr. Wade thought that the same offer should be made to all of the stockholders of the company; that the offer should be made public, and Mr. Wade further insisted that there should be put into the offer a statement that

the Mercantile Trust Company was to receive two and one-half per cent commission from the purchaser.

Mr. Scullin also testified to that. Wade had never acted in any manner for the Rock Island Company before that time and was not interested in any way in the St. Louis, Kansas City & Colorado Railroad Company. Before negotiations in New York took place, Mr. Low went over the Colorado railroad with Mr. Scullin and Mr. Sands and other employees of the road whose names he did not remember. Mr. Sands at that time was the general manager of the Colorado Railroad and also of the Wiggins Ferry and a director in the Wiggins Ferry Company. Mr. Low did not go over any part of the Wiggins Ferry property and made no examination of it until after the stock was purchased. Late in the afternoon of Saturday, April 26, Mr. Low, then at his home at Topeka, Kansas, received information over the telephone from Mr. Wade that another purchaser for the Wiggins Ferry stock was in the field. He immediately wired that fact to Mr. Mather in Chicago. The Mercantile Trust Company was paid by the Rock Island Company a commission of two and one-half per cent upon $500 per share for all the stock purchased by it. The defendant, John Scullin, testified that prior to April, 1902, the business of the Wiggins Ferry Company had been diminishing. It was being hard pressed by the Terminal Railroad Association and by the Interstate Transfer Company, the Missouri Pacific, the Vandalia and Interstate Car Transfer Company, and it had been compelled to lower its charges for transportation and ferriage to a considerable extent. The rate for transportation of coal was cut from thirty to fifteen cents per ton, and the coal business was a very large part of the business of the company; that cut in the rates was made by order of the board of directors of the Wiggins Ferry Company in March, 1902, although it had been discussed for more

than a year before it was put into effect. At the time of this change of rate neither Francis nor Scullin had any idea of selling the Colorado Road or the Wiggins Ferry Company. After the negotiations in New York for the purchase of the Colorado property were ended on Saturday, April 19th, the subject of the Wiggins Ferry Company came up, but Mr. Scullin declined to talk about the matter with them at that time, and said he would see them the following Monday. That Saturday evening about 8 o'clock, Mr. Scullin received a telegram from Mr. Wade asking if it was likely he would be in New York for three or four days longer; that he, Wade, would be in New York to attend a bankers' convention and wanted to see Mr. Scullin. Scullin then called Wade up over the long distance telephone and asked him to come to New York, saying he wished to talk with him, but did not say what about. Wade arrived in New York Monday morning, April 21st. Scullin saw him but did not tell him what he wanted to see him about, but made an appointment to meet him at the Trust Company of America at twelve o'clock. After the papers relating to the Colorado Road had been signed, Scullin left the office of the Rock Island Company to look up Mr. Wade. He found him about 2 o'clock and told him he had made a price of $400 per share as the price at which he was willing to sell his stock in the Wiggins Ferry Company. Wade objected to the price as being too low, and said they ought to pay $500 per share. Scullin told Wade he thought it was a little presumptuous on Wade's part to think that he knew more about the value of the property than Scullin, and was fearful that this would upset the sale; that in his, Scullin's, opinion or judgment, this would be probably the last opportunity, and if they did not sell to the Rock Island, the Wiggins Ferry would be kiting around town for less than $200 per share. After this they saw the Rock Island peo-

ple and the latter agreed to purchase the stock at $500 per share. The purpose of making the offer public was to enable every stockholder to get the benefit of the price that had been offered, so that brokers and outsiders would not have the opportunity of picking it up at a less price from the stockholders. On Tuesday, April 22, an agreement was reached that the Rock Island people should employ the Mercantile Trust Company to purchase the stock and authorized it to make the offer in the manner in which Wade and Scullin insisted that it should be made. Scullin put in his eight hundred shares of stock at $500 per share and did not receive anything more either directly or indirectly for the same. Scullin was asked if he was in any manner influenced in making the promise to the Rock Island Railroad Company, that he would recommend the sale to the stockholders of the Wiggins Ferry Company, by the fact that he at the time held five or ten thousand shares in the Rock Island Company, and he answered, "No, and if I had owned the whole road, it would not have made any difference to me," nor was he influenced by the fact that he was a stockholder in the Mercantile Trust Company. Scullin received the plaintiff's certificate of stock Saturday morning, April 26, about 10 o'clock and turned it over to the Mercantile Trust Company at $500 per share to be considered as a part of the stock purchases by the Mercantile Trust Company for the Rock Island and signed the acceptance on that morning. He testified that up to the time of the delivery of plaintiff's stock in the Mercantile Trust Company, he had not heard anything from anybody of any higher offer than $500 per share for the stock. After the delivery of plaintiff's stock to the Mercantile Trust Company, it was never returned to Scullin. With reference to the alleged meeting of the board of directors of the Wiggins Ferry Company on Saturday, April 26, 1902, he tes-

tified there was no meeting of the board, that four of the directors were present in the office and about three o'clock that afternoon Mr. Church appeared and stated that he had a proposition to lay before the board, he stated that the proposition was to sell the Wiggins Ferry Company stock at $600 per share. He was asked to state who made the proposition and declined; that this was all that took place. He further testified that nothing was said at that time in regard to the Mercantile Trust Company already having contracted for a majority of the stock. The first that he ever heard of the proposition made by the Mississippi Valley Trust Company was about nine or ten o'clock that Saturday night while he was at the Planter's Hotel. It also appeared that in closing up the Colorado deal, Scullin received only five thousand shares of the stock of the Rock Island Company, the other five thousand shares to which he was entitled being sold by him to Messrs. Leeds, Reed and Moore under the agreement made with them to take the same at $170 per share. He further testified that he inserted the sentence in the telegram of April 24th to plaintiff, "Please regard this as strictly confidential," because he was fearful that the people receiving these telegrams might tell others and the stockholders who had not received these telegrams might dispose of their stock for less than $500 per share to persons who had heard of the offer:

Festus J. Wade testified that he was elected a director in the Wiggins Ferry Company in January or February, 1902, to succeed Judge Madill, then recently deceased; that in order to qualify him for the office, Mr. Scullin transferred to him fifty shares of stock, and thereafter Mr. Wade purchased twenty shares of stock; that he secured fifteen shares in the latter part of February or the first part of March through the brokerage firm of G. H. Walker & Company, whom he had instructed to purchase for him as much as one

210 Sup—30

hundred shares at the market price; that he paid $237 a share for said fifteen shares, and early in April, 1902, he purchased five shares more at the same price. About April 10th, 1902, not having acquired more than these twenty shares last mentioned, he dictated a letter to his stenographer and gave her the names of half a dozen or more stockholders to whom the letters were to be sent. These letters were dated and mailed between April 10 and April 19th, the first on April 10th and the last on April 19th. They were all in the same form. Among them was a letter addressed to S. Prentiss Smith, which reads as follows:

St. Louis, Mo., April 12, 1902.

S. Prentiss Smith, Esq., 538 California street, San Francisco, Cal.

Dear Sir: I have recently been elected a member of the board of directors of the Wiggins Ferry Company, as successor of the late George Madill, and desire to purchase some stock, so as to have an interest sufficient to justify my giving the position the necessary time. Should you care to sell any of your holdings I shall be pleased to have you name a price on same.

Very respectfully yours,

Festus J. Wade.

The same form of letter was sent to Mrs. Wann, the plaintiff, on April 19th. In response to the letter to Mrs. Wann, Mr. Wade received a letter dated April 21st, from Mr. Wann, which has already been set out above, and in response to this letter of Mr. Wann's dated April 21st, he telegraphed to Mr. Wann April 24th, "John Scullin's telegram to your wife explains why I did not reply to your letter." On April 25th Mr. Wann acting for his wife, the plaintiff, wrote Mr. Wade as follows:

Monadnock Building, Chicago, April 25, 1902.

My dear Festus: Your telegram, also one from my good friend, Mr. John Scullin, received at my house last night at 7:45, and I answered the latter immediately, stating that I would forward

the Wiggins Ferry Company stock this morning, which I have done. I more than thank you for looking out for Mrs. Wann's interest. In this connection, I was offered last week 500 shares of the stock at $240 and am awfully sorry I did not telegraph Mr. Scullin, asking his advice. It is true, the party who offered it to me might not have been in the position to make delivery, but it makes a fellow feel sorry, just the same, that he did not take it. I expect to be in St. Louis in the near future, when I will do myself the pleasure of calling on you and my good friend, Mr. Scullin.

Very truly yours,

FRED A. WANN.

To Festus J. Wade, St. Louis, Mo.


On the same day Mr. Wade wrote a letter to Mr. Wann on the same subject, as follows:


April 25, 1902.

Fred A. Wann, Esq., care C. & A. Railway Co., Chicago, Ill.

MY DEAR MR. WANN: When I wrote your good wife last week about Wiggins Ferry stock I had no idea of the sale at the time. The next day, however, it developed that there was an opportunity to sell it, and I have been working on it ever since. As I was acting as agent for the purchaser, thought it would be unwise for me to write to you in regard to the matter until it was closed. Yesterday the authority to buy was given me and I immediately wired you, as did also Mr. Scullin. I sent you the following telegram which I now beg to confirm: "John Scullin's telegram to your wife explains why I did not reply to your letter."

Very truly yours,

FESTUS J. WADE.


In response to the letter written to S. Prentiss Smith, he received the following letter:


SAN FRANCISCO, CAL., April 17, 1902.

Festus J. Wade, Esq., St. Louis, Mo.

DEAR SIR: Referring to the contents of your favor of the 12th inst., upon the subject of Wiggins Ferry stock, I have fifteen shares which I have been holding for $250 per share, and would be pleased

to deliver them at any point you may indicate, if this offer is accepted during the current month. My preference would be to send the endorsed certificate by registered mail directly to your good self, to be paid for upon delivery by a check upon New York.

Respectfully yours,

S. PRENTISS SMITH.

Said letter was received in St. Louis on April 21st, while Mr. Wade was yet in New York, and his secretary on the evening of that day, telegraphed Mr. Wade of the option given him by Mr. Smith and Wade immediately telegraphed his secretary to do nothing with respect to Smith's option, and on his return to St. Louis on April 24th, sent Mr. Smith the following telegram:

ST. LOUIS, April 24, 1902.

S. Prentiss Smith, 528 California street, San Francisco, Cal.

Your option of April declined in view of the fact that stock has been sold at $500 per share, provided a majority can be delivered. President Scullin wires you fully to-night.

FESTUS J. WADE.

A telegram similar to the one sent to Mrs. Wann was sent to Mr. Smith on the evening of the 24th of April, and on the 25th of April Wade wrote a letter to Mr. Smith as follows:

ST. LOUIS, Mo., April 25, 1902.

S. Prentiss Smith, 538 California street, San Francisco, Cal.

DEAR SIR: Your favor of the 17th reached me in due time, but in the meantime I have been working on a deal which came up rather suddenly for the sale of the entire stock of the Wiggins Ferry Company. I have accomplished the result and sold the stock at $500 per share, provided I can deliver more than a majority of the stock on the fifth of May. In view of that fact, I did not think it would be just to you to take advantage of your offer, hence I sent you the following telegram, which I now confirm: "Your option of April 17th declined, in view of the fact that stock has been sold at $500.00 per share, provided a majority can be delivered.

President Scullin wires you fully to-night." If you have not already done so, I advise you to send Mr. Scullin your stock immediately, in compliance with his telegram.

Yours truly,

FESTUS J. WADE.

Mr. Smith availed himself of the offer by telegram of April 25th, 1902, and forwarded his stock to Mr. Scullin accordingly. The same telegram concerning the fact that the Mercantile Trust Company had contracted for a majority of the stock, was sent to Mr. Smith on April 27th, as was sent to all other stockholders. Smith in response to this telegram wrote Wade as follows:

SAN FRANCISCO, CAL., May 1, 1902.

Festus J. Wade, Esq., President,

     Mercantile Trust Company, St. Louis, Mo.

DEAR SIR: But for your explicit telegram of the 27th ult., I should now be in serious suspense as to where I stand in the Wiggins Ferry deal; upon the day on which the wire was received I was tendered right here a $9,000 check for my fifteen shares, to which I was obliged to reply that my holdings were not free. It then dawned on me that my contract was binding upon me, but conditioned on the part of the purchasers. Your wire has set that question at rest. If the matter has been settled, I would be pleased to receive proceeds either by check on St. Louis, or New York, the latter preferred if obtainable at par. With renewed thanks to you and Mr. Scullin for your good care of my interests, I remain,

Faithfully yours,

S. PRENTISS SMITH.

On April 28th, Smith wrote a letter to Mr. Scullin, as follows:

SAN FRANCISCO, CAL., Monday morning,

April 28th, 1902.

John Scullin, Esq., St. Louis, Mo.

MY DEAR SIR: Your telegram of Saturday has been answered to-day. By to-morrow morning you will receive my letter of the 25th

with my Wiggins Ferry stock certificate. I have also a telegram from Mr. Wade, and regret that you and he should consider it necessary to embarrass me with the sense of my obligation in the premises. Though I have a firm offer to-day of $600 per share for my stock, I still feel under obligations to you and Mr. Wade for taking me into the syndicate and selling my stock for $500 per share, instead of accepting my offer for $250 per share. My understanding is that I am getting the same price you receive, and it looks as if we both might have done a little better, but it would have taken some remarkable guessing. From the terms of a certain telegram shown me to-day I think that $1,000 per share could be obtained for my stock if I were free, but I viewed the matter differently last Friday, when I was apprehensive of a purchaser obtaining their majority before I could get in. It is not my nature to hold out for miracles. Renewing my thanks to you and Mr. Wade for your good care of my interests (though we miss the miracle), I remain,

Very truly yours,

S. Prentiss Smith.

It appears from the evidence that Mr. Scullin had signed the acceptance of the proposition of the Mercantile Trust Company in behalf of Mr. Smith in the same manner as he had accepted the same in behalf of Mrs. Wann, the plaintiff. It also appeared that Wade received responses from about a half a dozen other stockholders of the Wiggins Ferry Company in reply to his letters of April 12th and 19th, soliciting offers of their stock, and that they were all treated in the same way as Mrs. Wann and Mr. Smith, except that about April 12th, he purchased from George C. Hitchcock, who lived in St. Louis, five shares at $237 per share. The uncontradicted testimony of Mr. Wade shows that he was first informed of the sale of the Colorado Road to the Rock Island Company by Mr. Scullin on or about April 23rd or 24th on their way home from New York. He corroborated Scullin in regard to his going to New York on the 19th of April. He met Mr. Scullin on Monday morning and the latter said to

him he could not yet just explain the purpose for which he had requested Mr. Wade to come to New York. An appointment was made to meet later in the day. When they met in the afternoon at 2 o'clock Scullin told him in great confidence that he had agreed with some parties, whom he did not name, to sell his Wiggins Ferry stock for $400 per share. Mr. Wade urged him that they ought to give a larger price. That afternoon about three o'clock they met at the office of the Rock Island Railroad Company and discussed the matter, Wade standing for $500 per share, although according to Scullin's opinion they were treading on dangerous ground to ask so much. During the conference it was suggested by some of the Rock Island officials that perhaps the best way to purchase this stock would be to endeavor to buy it up quietly at the lowest price, but Wade opposed this plan and Scullin said he could not sell his stock to anyone without letting the stockholders know exactly the price he had got for it; that he had been with the company sixteen years, and wanted everyone of the stockholders to know exactly what he was getting for his stock, and unless that was satisfactory his stock would not be sold under any conditions to anybody. Scullin was asked what he would do in reference to recommending to the stockholders the sale of their stock; he replied that he would recommend it; that he would sell them his stock and recommend the stockholders to sell theirs. Mr. Mather, the general counsel for the Rock Island Company, prepared the form of the offer for the stock, but did not mention therein that the Trust Company was to receive two and one-half per cent from the purchaser. Mr. Wade insisted that this should be in the offer. Wade testified that he had every reason on earth to believe and did believe that $500 per share was a big price for the stock of the Wiggins Ferry Company. Wade and Scullin left New York on April 23, and arrived in St. Louis

April 24th and immediately proceeded to send out telegrams communicating the offer to all the non-resident stockholders, and write letters to all the resident stockholders requesting them to call at the office of the company where something of importance would be communicated to them. He testified that the only object in sending out the letters and telegrams to all the stockholders at the same time was to protect the stockholders so that their stock could not be bought for less by any one having prior information as to the sale of the stock at $500 per share. Among these telegrams was one sent to the plaintiff, Mrs. Wann. Mr. Scullin turned in all of his stock, 800 shares, at $500 per share to the Mercantile Trust Company and received the Company's check for the price of $500 per share, and did not receive anything more either directly or indirectly. Mr. Wade turned in his twenty shares and received for them the sum of $500 per share.

Wade testified that at the time he was endeavoring to purchase some stock for himself, he had no knowledge whatever that the Rock Island Company desired to purchase the Wiggins Ferry Company stock or the Colorado Railroad and had no knowledge of any intention on Scullin's part to sell either the Colorado Railroad or his stock in the Wiggins Ferry Company. He corroborated Mr. Scullin's testimony in regard to the strong opposition that had developed against the Wiggins Ferry Company and as to the reason for cutting the price for transportation. In relation to Mr. Church's testimony in regard to communicating to the directors of the Wiggins Ferry Company the offer of $600 for the stock, he testified that about three o'clock on Saturday afternoon of April 26th, 1902, he was sitting in Mr. Scullin's office, and Mr. Church came in and Mr. Peugnet happened to be there; Mr. Church stated that he would like to have a meeting of the board; that he had some matters he wanted to submit. "Mr.

Sands, Mr. Scullin, Mr. Church, Mr. Peugnet and my-self constitute the board.  It just happened we were all there.  Mr. Sands was in his office, that is, the general manager's office, and he was called in.  Mr. Church, up to that time, had not, as far as I knew, expressed his dissatisfaction to me about the sale of the stock; he then said that he was informed that he could get a purchaser for the stock at $600 per share; that he had taken advice of eminent counsel and that they advised him to notify us to that effect.  Some of the gentlemen made the reply that the sale of the stock of the corporation had nothing whatever to do with the board of directors; that the directors could not, if they wanted to, sell the stock, and could not interfere with the stockholders in selling the stock one way or the other.  That was the whole of it.  The conference did not take more than three minutes.  Mr. Church was asked to state who it was that made this proposition, and he said he was not at liberty to state who the party was.  No statement was made at that conference that the Mercantile Trust Company had already secured the majority of the stock.''  Mr. Wade further testified that about six o'clock of Saturday evening, April 26, 1902, he heard a rumor to the effect that a higher price than $500 per share was being offered for the stock, and this rumor was confirmed about 11:30 that night or early the next morning. On hearing this rumor about six o'clock p. m. April 26th, 1902, Mr. Wade communicated with Mr. Low at Topeka by telephone, and Mr. Mather, the general solicitor of the Rock Island Company, arrived in St. Louis the following Sunday morning, April 27th, 1902, about 7 o'clock.  Upon the arrival of Mr. Mather in St. Louis the battle for the control of the Wiggins Ferry stock became very warm and continued until every share of the stock had been bought by the two contending trust companies.  Upon Mr. Mather's arrival in St. Louis he took charge of

the matter for the Rock Island Company and the Mercantile Company received its instructions from him. Mr. Wade testified that the sole purpose of inserting in the telegram of April 24th, which announced to the stockholders of the Wiggins Ferry Company the offer of the Mercantile Trust Company, the words, "Please consider this strictly confidential," was to give each of the stockholders the information of the offer, and that he would keep it confidential until every other stockholder got the same information. It was not for the purpose of preventing stockholders from making inquiries in regard to the matter or in regard to the advisability of selling their stock. He also testified that when he reached New York Mr. Scullin did not communicate to him the fact that the Colorado Road had been sold to the Rock Island Company, nor the fact that Mr. Scullin had acquired any shares in the Rock Island Company, and did not in fact learn of Scullin's interest in the Rock Island Company until the latter part of June, 1902, and never did obtain that information from Scullin himself, but from another source, but not until he heard Mr. Scullin testify at the trial of this case.

There was no rebuttal testimony offered and the foregoing is substantially all the material evidence in the case.

I. As already said, the circuit court granted a new trial on the ground that its second instruction given in behalf of the plaintiff was erroneous. That instruction was in the following words:

"The jury are instructed that if they believe from the evidence that John Scullin had a pecuniary interest, as a stockholder, in the Chicago, Rock Island & Pacific Railway Company, and, while he had such interest, solicited from the plaintiff the possession and control of her fifty shares of stock in the Wiggins Ferry

Company, in order to sell it to the said Chicago, Rock Island & Pacific Company, but did not disclose to plaintiff his interest in said railway company, and thereafter, in response to his solicitation, he received plaintiff's stock and thereafter placed her stock in possession of the Mercantile Trust Company, the purchasing agent of said railway company, and it was withheld from her and she was thereby deprived of her said stock, and the opportunity to sell it, and that plaintiff was ignorant of such interest of said Scullin in said railway company, then said acts and concealment was a fraud upon plaintiff, and if you find that thereby plaintiff has sustained damages, she is entitled to recover against defendant Scullin, and if you further find from the evidence that at the time said Scullin solicited the stock, he did so at the request of the Mercantile Trust Company, acting through the defendant Wade as its president, and that said Wade, at the time of such solicitation, or at the time the stock was delivered to said trust company, knew of said interest of said Scullin as a stockholder in said railway company, and did not communicate the fact of such knowledge to plaintiff, and that she was at such times ignorant of such interest, and has, by reason of such concealment, sustained damages, then she is entitled to recover as against all the defendants.''

While the record is voluminous, the fact upon which the recovery was permitted in the circuit court under the above instruction, was that defendant Scullin was a stockholder in the Rock Island Railway Company to which he sold plaintiff's stock and did not disclose that fact to plaintiff. Conceding that the relation of principal and agent was established by the authority given by plaintiff to the defendant Scullin to deliver her stock to the purchaser of whom he had advised her and intrusted her stock to him, all the facts and circumstances in evidence demonstrate that

it was a gratuitous agency for which the defendant. Scullin was to receive no reward or compensation. Up to the time he sent plaintiff the telegram of April 24, 1902, he bore no confidential relation to her, either as agent or trustee. Like plaintiff he was a stockholder in the Wiggins Ferry Company. The overture of the Rock Island Company to buy the majority or all of the Wiggins Ferry stock at $500 per share, a price double that for which it had ever been sold, had been made to him and Mr. Wade only a day or two before, and instead of selling his own stock and permitting the Rock Island officers to buy their stock of the other stockholders quietly at the then market price, he had insisted that every stockholder should have the same offer, and as a friendly act immediately upon his return to St. Louis proceeded to advise all the stockholders of the offer, advising them that he had agreed to sell his own holdings at the price offered and recommending them to do so. Each stockholder was left free to accept or reject that offer. Each was left free to make further investigation for herself or himself. He made no false representation of any kind whatever and up to that time was under no obligation to make any disclosures as to the purchaser. He had simply performed a friendly act to each stockholder, treating them all alike.  The material fact of which each stockholder was notified was that he or she could dispose of his or her shares of stock at $500 per share, and that the defendant Scullin, the president of the company, had agreed to sell his at that price and had a purchaser which would take the whole stock at that price or a majority thereof, if it was offered by May 5, 1902. Every fact which defendant knew at that date affecting the value of this stock was made known to plaintiff. He had agreed to sell his own 800 shares at $500 per share, but his sale was subject to the right of the Rock Island Company to refuse to take it unless it acquired

the majority. Up to that time, at least, defendant Scullin's interests were not only not adverse to the plaintiff's, but were identical with hers, save that he had a much greater interest in effecting the sale than she had, as he had eight hundred shares and she only fifty. Moreover, defendant Scullin did not, as hypothesized in the instruction, solicit the shares that he might sell them to the Rock Island. He communicated to her, as he did to all the other stockholders, the offer that had been made to him, and told her that he had accepted it, and said to her that if she desired to accept the offer she could send it to him and he would see that she received the price offered. The plaintiff was left free to accept the offer and to determine whether she would sell. She accepted the offer and fixed the price by her letter of April 25, 1902. By accepting the offer and sending the stock to defendant Scullin, she did constitute him her agent for the purpose of delivering her stock and receiving the agreed price therefor. This agency did not require Scullin to counsel and advise Mrs. Wann as to what she should get. By her acceptance, she fixed her own price for the stock, and the duty devolved upon Scullin, under the directions of her acceptance, was to deliver her stock and receive the price if the purchaser elected to take it. The agency was an exceedingly limited one, and did not require of him judgment and discretion as to holding it.

In Gold Mining Company v. Fox, 4 Iredell's Eq. 61, it was said: "It is a well-established principle in equity that an agent cannot make himself an adverse party to his principal while the agency continues; he can neither make himself a purchaser when employed to sell, nor, if employed to purchase, can he make himself the seller. In both cases he is but a trustee for his principal; . . . but the rule applies only to agents who are relied upon for counsel and direction, and whose employment is rather a trust than a service; and

not to those who are merely employed as instruments in the performance of some appointed service.''

In Kilbourn v. Sunderland, 130 U. S. 505, the plaintiffs had employed defendants as their agents to purchase real estate in Washington City. Among other properties, plaintiffs directed defendants to ascertain the owner and the lowest price for which square 115 in said city could be bought; the defendants informed plaintiffs that the lowest price was $65,000, to which plaintiffs agreed and directed them to complete the purchase, which they did. As a matter of fact defendants were then the owners of said square, having bought it prior to their agency for plaintiffs for $40,000. The plaintiffs brought their suit in equity for an accounting and to recover the $25,000, but the Supreme Court of the United States said: ''The relations between the parties were such that Kilbourn and Latta should have disclosed that they were acting as principals in this sale, but the complainants suffered no pecuniary loss for want of such disclosure, since they took the property *at their own price*. Their remedy, if they were deceived, lay in throwing up the bargain, but they did not do so, and could not treat it, as is well said (3 Mackey, D. C. 525), 'as a contract fulfilled and as a contract broken.' ''

So in Atwood v. Railroad, 85 Va. 966, it appeared that Clark & Co., the financial agents of the Railway Company, when the general mortgage bonds were placed on the market negotiated them for the company on commission. The price of the bonds were fixed by the Railway Company and they were sold by Clark & Co., who acted in entire good faith. A syndicate with which the members of the firm of Clark & Co. were connected, purchased a large portion of the bonds, the proceeds being paid to the Railway Company and used in the construction of its road. It was held that the fiduciary relation between Clark & Co. and the Railway

Company did not invalidate the purchase made by the syndicate of which they were members, inasmuch as the Railway Company *had fixed its own price upon the bonds* to be sold by Clark & Co. and had obtained that price.

In Carpenter v. Danforth, 52 Barb. (N. Y.) 581, Judge SUTHERLAND observed where there is no evidence to show that on a sale of stock by a stockholder to a director of the corporation, the purchaser made no material representation as to the affairs or condition of the company or of any fact material to the question of the value of the stock or any false representation of the material fact that induced the sale; or that he either did or said anything to mislead the seller or to divert or prevent him from ascertaining all that could then be known of the affairs, condition and prospects of the company; or from making any inquiry as to any fact material on the question of the value of the stock; or that the purchaser did anything which misled or deceived the plaintiff or was likely to mislead or deceive him; or which diverted or was liable to divert or prevent him from learning all that he, the purchaser, knew about the value of the stock or any fact material to the question of value, it could not be held there was any fraudulent concealment as would sustain a decree.

It must be kept steadily in view that this is an action for fraud and deceit. In People's National Bank v. Central Trust Company, 179 Mo. l. c. 662, it was said: "Fraud is a willful wrong. Some writers have undertaken to draw a distinction between fraud in fact and fraud in law, but fraud, under any definition, implies the doing of a wrong willfully. Sometimes, without proof of an actual evil purpose, the law will imply fraud, but only so in a case where one has been so oblivious of his duty, showing such a disregard for the rights of others, as to make his conduct as bad as if actuated by a desire to do wrong. If it were not

·necessary in an action of this kind to prove fraud, but only to prove that the representation was untrue .and from that fact alone to draw the presumption of fraud, then there would be no difference in the char-.acter of the proof required to sustain an allegation ·of the breach of a contract of guaranty, and that re-·quired to sustain an allegation of the breach of a duty ·to deal honestly; and, in a case like this, the averments in the petition above quoted would be unnecessary.''

It is not asserted, and indeed could not have been, ·that the telegram from the defendant Scullin of April ·24, 1902, to the plaintiff in this case, contained any ·false statement and hence, as already said, the case ·on this instruction was and is narrowed down to the fact of the concealment of Scullin's ownership of stock ·in the Rock Island Company, to which he sold not only plaintiff's fifty shares of stock, but his own eight hun-·dred shares for the same price. It is the settled law ·that an agent owes to his principal the most perfect ·good faith and loyalty to the principal's interest, and will not be permitted to take upon himself the character ·of an agent where on account of his relation to others ·or on account of his own personal interest, he would be compelled to assume incompatible and inconsistent ·duties and obligations. [Euneau v. Rieger, 105 Mo. ·659.] Upon this groundwork the plaintiff takes her position and advances the proposition that an agent ·to sell cannot sell to a corporation in which he is a stockholder, without disclosing to his principal the ·fact that he is a stockholder in such corporation and receiving the consent of his principal to the sale in ·the light of such disclosure. We are cited by the ap-pellant to many cases to illustrate the foregoing con-·tention. Unquestionably it is the general rule that the contracts of a party procured by an agent who has an interest in the subject-matter of the agency, which is ·undisclosed to his principal, are voidable by the prin-

cipals in a proper action brought for that purpose. Thus, in McCullough Export Company v. Bank, 111 Ga. 132, a sale made by a commissioner appointed by the court to sell the assets of an insolvent company at a sale to be reported by him to the court for confirmation, was set aside because he sold said assets to a banking corporation of which he was a stockholder and director, although it was not shown that there was any unfairness in the sale, or that the property brought less than its value. In that case, the objections were promptly filed to the confirmation of the sale. In Salomons v. Pender, 3 Hurl. & C. Ex. 639, an agent employed to sell land sold it to a company in which he was a stockholder and director, and it was held that he was entitled to no commission from his employer in respect to the sale. In San Diego v. Railroad, 44 Cal. 106, it appeared that the corporate authority of the city was vested in a board of three trustees, McCoy, Sherman and Estudillo. By an act of the Legislature the city authorities were authorized to donate to the railroad company not to exceed five thousand acres of the Pueblo lands of said city, or such pieces or parcels thereof as they might deem advisable, and upon such terms and conditions as they might determine. On the last day of the official life of this board of trustees, they met and by the vote of Estudillo and Sherman in the affirmative and McCoy in the negative they passed a resolution granting five thousand acres of land to the railroad company under the said act of the Legislature, and directed a deed to be given to the company. No land having yet been selected to be conveyed in performance of the resolution and McCoy and Sherman refusing to participate in making the selection, Estudillo in the office of the board proceeded to select ninety different parcels containing in the aggregate five thousand acres; he and Sherman then within an hour or an hour and a half after the passage of the

210 Sup—31

resolution executed, acknowledged and delivered to the railroad company a deed for the land thus selected. At this time Sherman was an owner of stock in the railroad company to the amount of $10,000 and one of its directors. Upon a bill to set aside the deed thus made, it was decreed that it should be cancelled on the ground that Sherman was a trustee and agent for the city and while holding this office could do nothing inconsistent with those relations, and as it took his vote to pass the resolution and he held an inconsistent and incompatible interest in respect to the city and the railroad. In Sterling v. Smith, 97 Cal. 343, an agent invested money belonging to his principal for the purchase of an interest in a syndicate of which he was at the time a member, and which was indebted in a large amount, and to induce the investment led his principal to believe that he was not a member of the syndicate, and represented to his principal that she would not have any calls to pay upon becoming a member thereof, and it was held that the principal might avoid the transaction and recover from the agent the amount so invested, on the ground that an agent should not unite his personal and representative characters in the same transaction, and the sale was voidable at the option of the principal, and nothing except the principal's confirmation after a knowledge of all the facts would defeat the principal's right of remedy. These cases sufficiently indicate the general proposition for which plaintiff contends. While recognizing the full force and soundness of these cases, we are of the opinion that the rule above referred to is not an arbitrary one, certainly it has not been applied in all its rigidity by this court in all cases. Thus, in Hardwick v. Jones, 65 Mo. 54, the validity of an execution sale was attacked on the ground that Sheriff Long, who made the levy, and Sheriff Gittings, who made the sale, were both stockholders in the purchasing corporation,

which was also the plaintiff in the execution. Our stat-
ute provided that the coroner should execute writs
and perform all other duties of the sheriff when the
sheriff was a party or interested in the suit or in any
manner disqualified from acting. In holding the levy
and the sale valid, this court said: "It is contended
by the plaintiffs in error that the levy made by the
sheriff, Long, he being a stockholder in the bank (plain-
tiff in the execution), as also the sale made by Gittings,
he being likewise a stockholder in the bank, rendered
the sale on the executions void, and in support of this
position we have been referred to numerous authorities,
which we have carefully examined and find that they
do not sustain the appellant. . . . In the case at
bar, Gittings, the sheriff, was neither the purchaser
nor interested in the purchase. That the bank in which
he was a stockholder purchased, did not constitute the
sheriff a purchaser." In that case the precise ques-
tion was determined that the interest of a sheriff as
a stockholder in the purchasing corporation did not
constitute an adverse interest in him so that he could
not act in making the sale.

In Kitchen v. Railroad, 69 Mo. 224, it appeared
that a number of persons had organized a corporation
to purchase the remaining bonds of the North Missouri
Railroad Company, at seventy-two and one-half per
cent and for the purpose of acquiring the railroad
itself if deemed profitable. Among the persons who
organized this corporation were three of the directors
of the North Missouri Railroad Company, namely,
James S. Rollins, Jas. H. Britton and E. W. Fox.
After this corporation was formed James B. Eads
presented a proposition to the board of directors of
the North Missouri Railroad Company offering to pur-
chase the remaining bonds of that company, amount-
ing to $3,600,000 at seventy-two and one-half cents on
the dollar less a commission of three and one-half per

cent on the dollar; in other words, for sixty-nine cents on the dollar to the railroad company. Although this proposition was made by Mr. Eads, in his own name, he testified that other parties who had joined in organizing this corporation had an interest in the proposition and it was made in behalf of them all. It was contended that the fact that Rollins, Britton and Fox were interested in the purchasing company tainted the transaction with constructive fraud, but this court, through Judge NORTON, said: "It is, however, insisted and urged with great ability and much plausibility by counsel, that inasmuch as three of the eighteen persons who signed these articles were directors of the North Missouri Railroad Company, the sale of these bonds was a sale made to themselves, and it thereby became a constructive fraud, and the association should be treated as holding the $360,000 which it realized from the sale of the bonds more than it paid for them in trust for the North Missouri Railroad Company. . . . Conceding that they were cognizant of and were interested in the purchase of the bonds at the time they were sold, it may be upheld under the authority of the following cases: Buell v. Buckingham & Co., 16 Iowa 284; Hartridge v. Rockwell, R. M. Charlton (Ga.) 260; Twin-Lick Oil Company v. Marbury, 91 U. S. 587." Considering the condition of the railroad at that time, its need of money, and the fact that it had not been able to sell its bonds above sixty-five cents on the dollar before that time, the court held the transaction could not be regarded as fraudulent. That was a suit in equity to set aside the transaction and it is elementary that in a suit in equity much less is required to sustain the charge of fraud than in an action at law for fraud and deceit.

In Alexander v. Williams, 14 Mo. App. 13, it was sought to avoid a contract entered into by two corporations on the ground of fraud, because some of the

directors in one were also directors in the other, and the court said: "It is a well-settled principle that one person cannot act in a trade in two positions which impose different obligations which would raise a conflict between interest and duty. Directors of corporations and all persons acting in a fiduciary capacity are subject to this rule. It would follow that the same persons ought not to act as agents of different companies in their mutual transactions, where the interest of the several companies would be opposed, and it would be the duty of the agents of each company to favor it at the expense of the other. Nevertheless, we have found no case where it has been held that a transaction between two corporations is void, merely because all the directors of one corporation were also directors of the other. On the other hand, it has been held that a contract of a corporation is not rendered void by the fact that some of the persons assisting to make the contract, and taking part in the performance of conditions, and in acceptance of performance, were officers in both corporations, and represented both to the extent of their respective powers."

So that it cannot be said without qualification that the mere fact that one is a stockholder in a corporation entirely disables him from representing a third party in a business transaction with such corporation. Numerous well-considered cases hold that a corporation is a legal entity distinct from the purposes of its contracts from the persons who own its stock, and the fact that the same person is president of two corporations will not of itself invalidate dealings between the two corporations as a matter of law, nor make the contract into which they enter void *per se,* but affords a ground for subjecting it to the closest scrutiny by the courts when challenged by a party entitled to challenge it. [3 Thomp. Corp., sec. 4079, and cases cited; Van Dusen-Harrington Co. v. Jungeblut, 75 Minn. 298.]

In the case last cited, the plaintiff corporation pur-
chased wheat at defendant's request, on margins. The
price declined and defendant refusing to respond for
further margins, plaintiff sold the wheat at a loss to
another corporation, some of whose officers and stock-
holders were officers and stockholders of plaintiff.
Plaintiff sued defendant for the loss and defendant con-
tended the sale was invalid because some of the plain-
tiff's stockholders were also stockholders in the pur-
chasing company. The Supreme Court of Minnesota
said: "The two corporations were separate entities
and the mere fact that some of the officers of one are
officers of the other is not sufficient alone to avoid the
sale. Defendant must show that some prejudice or
injury resulted to him from the fact that the two cor-
porations were thus related. [3 Thomp. Corp., sec.
4079.]"

In our opinion the said instruction number two
was erroneous and should have been refused, and the
court properly granted a new trial for having given
the same, because the mere fact of defendant Scullin's
failure to disclose to the plaintiff that he was a stock-
holder in the Rock Island Company, and the said com-
pany was the intending purchaser, was not in law a
fraud upon the plaintiff, and did not disqualify him
from receiving from plaintiff her stock and delivering
the same to the Mercantile Trust Company under the
terms of the telegram of April 24th.

As to the defendant Mercantile Trust Company
and Wade, the instruction was erroneous, because there
was no evidence in the case that Wade knew that Scul-
lin was a stockholder in the Rock Island Company at
any of the times mentioned in the instruction. The
plaintiff offered no evidence showing such knowledge
in the defendant Wade and it is not pretended that
the trust company had any information save and ex-
cept that which it received through Mr. Wade, and

Mr. Wade testified positively that he had no such knowledge and hence could not have imparted that fact to the plaintiff in the case.

In addition to what has already been said we think this instruction is also fatally defective for the reason that it did not require the jury to find that the failure of Scullin to disclose his ownership of stock in the Rock Island Company and that said company was the intending purchaser, were material inducements to the plaintiff's action in sending her stock to defendant Scullin in response to his telegram of April 24th, nor that she relied upon the non-existence of such facts and would not have sent her stock had she known the facts. In 14 Am. and Eng. Ency. Law (2 Ed.), 113, the rule is tersely stated as follows: "The principle that false representations must be relied upon in order that they amount to fraud, applies with full force where failure to disclose facts or concealment of facts is relied upon as constituting fraud. It is essential, in order that an action of deceit may be maintained or a contract rescinded because of non-disclosure or concealment of facts, that the person complaining shall have been deceived; or, in other words, that the circumstances shall have been such that he would not have acted if the truth had been disclosed." And in 20 Cyc. 40, it is said: "Where concealment is the ground of the action, it must appear that plaintiff relied on defendant to make disclosure of the fact concealed, and that the concealment was a moving inducement to the plaintiff's change of position." Not only was this not submitted to the jury by the plaintiff's instructions, but there is no evidence in the record that plaintiff would have acted otherwise had she known that defendant Scullin was a stockholder in the Rock Island Company, and that the Rock Island Company was the intending purchaser. [Tinker v. Kier, 195 Mo. 183;

Powell v. Adams, 98 Mo. 604; Bailey v. Smock, 61 Mo. l. c. 218.]

Not only was this instruction erroneous for the reasons assigned and therefore the circuit court committed no error in setting aside the verdict and granting a new trial, but in our opinion there was no evidence of fraud perpetrated by either of the defendants upon the plaintiff, or any fraudulent motive or intent on their part upon which to submit the case to the jury. The transactions involved in this case were the same as those which were before this court in the case of Newman v. Mercantile Trust Co., 189 Mo. 423. And this court in that case held after a careful perusal and consideration of the evidence that was rejected in that case, being practically the same as that in this case, that there was no evidence tending to prove the perpetration or even the contemplation of any fraud on the plaintiff or any other person. On the contrary, the evidence abundantly establishes that the defendants Scullin and Wade not only were not moved by any fraudulent purpose in advising plaintiff to sell her stock for $500 per share, but were actuated by a desire to deal justly and fairly, not only with the plaintiff, but with every stockholder of the Wiggins Ferry Company, in endeavoring to sell said stock to the Rock Island Company. Prior to the time that the Rock Island Company through the Mercantile Trust Company offered to purchase this stock for $500 per share, it had never sold, according to the great weight of the evidence, for a price exceeding $250 per share. And until the telegrams and letters of April 24th* were sent out to the stockholders by Messrs. Wade and Scullin, there is not the slightest ground for supposing that any one thought this stock could be sold for $500 per share. The defendant Scullin was willing to sell his shares of stock for $400 per share until Mr. Wade advised him that the Rock Island Company could

be induced to pay $500 per share for it. How Scullin and Wade could have acted more fairly and justly with the stockholders than they did when they refused to permit an offer to be made to any stockholder for less than the price which the Rock Island Company had indicated to them it would pay for the stock, and immediately upon their return to St. Louis from New York notified every stockholder, including the plaintiff, that this offer had been made, and that each one of the stockholders could avail himself of it, is beyond our comprehension, and it is indisputable that no higher price was offered for the stock until the Mississippi Valley Trust Company, acting in behalf of the Terminal Association, made its offer to pay $500 per share absolutely and an additional offer of $100 per share in case it could acquire the majority. But before any such offer was made, the defendant Scullin, acting upon plaintiff's letter, had already delivered her stock, as well as his own, to the Mercantile Trust Company, in pursuance of the offer which it had made to all the stockholders. The action of the defendant Scullin in the disposition of plaintiff's stock must be determined by the conditions which surrounded him at the time he delivered his own stock and that of the plaintiff's and not by the subsequent action of the Mississippi Valley Trust Company, which was taken late in the afternoon or evening of April 26th, after Scullin had delivered his own stock and the plaintiff's to the Mercantile Trust Company. That plaintiff and her husband at the time they accepted the offer for her stock were entirely satisfied with the offer made them by the defendant Scullin, does not admit of a doubt, in view of the letter written by the plaintiff to Scullin on the 25th of April, in which she said: "Many thanks for your telegram, which was received at my house late last night. I answered you immediately that I would forward my stock this morning, so I take pleas-

ure in forwarding you herewith fifty shares, certificate number 293, and I trust the sale will go through as per your telegram." And a letter of plaintiff's husband to Mr. Wade on the same date, in which he said: "Your telegram, also one from my good friend Mr. Jno. Scullin received at my house last night at 7:45, and I answered the letter immediately stating that I would forward the Wiggins Ferry Company stock this morning, which I have done. I more than thank you for looking out for Mrs. Wann's interest. In this connection I was offered last week five hundred shares of the stock at $240, and I am awfully sorry I did not telegraph Mr. Scullin asking his advice. It is true the party who offered it to me might not have been in a position to make delivery, but it makes a fellow feel sorry just the same that he did not take it." Neither Wade nor Scullin were required to anticipate that another trust company would not only increase their offer for this stock on a condition of acquiring the majority of it but would go to the extent of offering to indemnify stockholders who had already entered into valid contracts to sell their stock to the Mercantile Trust Company against loss and damage if they would violate said contracts with the Mercantile Trust Company. These subsequent events could not reasonably have been anticipated by either of the defendants.

In our opinion the plaintiff wholly failed to establish any fraudulent intent to deceive her into parting with her stock, and the court should have directed a verdict for the defendants upon the issue which the plaintiff had tendered, to-wit, that of fraud and deceit.

Accordingly, the judgment of the circuit court is affirmed. *Fox, P. J.,* and *Burgess, J.,* concur.